## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**THELMA ROSARIO,**
Petitioner,

v.

**COMMISSIONER OF SOCIAL
SECURITY**,
Defendant.

Civil No. 19-1413 (BJM)

## OPINION AND ORDER

Thelma Rosario ("Rosario") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Rosario contends that the administrative law judge's ("ALJ") decision must be reversed because (1) the ALJ improperly weighed the opinion evidence in assessing her mental residual functional capacity ("RFC"), (2) the ALJ failed to provide a function-by-function assessment when determining her RFC, and (3) the ALJ failed to find her disabled under the Commissioner's Medical-Vocational Guidelines ("the Grid"). Docket No. ("Dkt.") 15. The Commissioner opposed. Dkt. 16. This case is before me by consent of the parties. Dkt. 5, 9. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence

means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is

conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rosario v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Rosario was born on January 7, 1962. Tr. 467. She completed her GED and earned a living by cleaning hospitals, Tr. 31, 46, 471, but she left her job and moved to Puerto Rico when her mother needed her assistance. Tr. 47. Rosario's mother had undergone knee surgery, and Rosario planned to take care of her during her recovery. *Id.* After moving to Puerto Rico, however, Rosario could not find another job. *Id.* She fell into a depression and developed anxiety, alongside various other ailments, including chronic back and neck pain. Tr. 42, 47-48.

On May 15, 2013, Rosario applied for disability benefits, claiming an onset date of August 29, 2010. Tr. 21. The Commissioner denied Rosario's claim initially, on reconsideration, and after

a hearing before an ALJ. *Id.* The record before the Commissioner, which included medical evidence and Rosario's self-reports, is summarized below.

In a function report dated June 18, 2013, Rosario explained that pain and depression prevented her from performing any work. Tr. 113. She reported limitations related to lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using hands, memory, completing tasks, and following instructions. Tr. 118. She also stated that she could not concentrate and was easily distracted. *Id.* Rosario reported that she could not lift more than ten pounds and that she had difficulty dressing, bathing, and caring for her hair because she struggled to raise her arms above her shoulders and could be easily hurt. Tr. 114, 118. She also needed someone to come to her home to help with all the chores. Tr. 115. Although Rosario did not require reminders to take care of her personal needs, she needed reminders to take medications. Tr. 114-15. She could prepare her own simple meals, such as sandwiches, cereal, and frozen meals, but she could not prepare complicated meals as she once did. Tr. 115. Rosario also reported that she could not go out alone and could not drive, though she could get to medical appointments by public transport or if someone gives her a ride. Tr. 116. She could shop for quick items in stores, though it would take her a lot of time. *Id.* Although she could pay her bills and count change, she could not manage a savings account or use a checkbook. *Id.* Rosario also reported that she did not spend time with others, and she had problems getting along with family, friends, and neighbors because she could not tolerate being spoken to about the same things all the time. Tr. 117-18. She also stated that she was once fired from a hospital because she could not stand the pressure from other people. Tr. 119.

Medical records show that Rosario sought treatment for chronic back and cervical pain, varicose veins, and other ailments. From November 1, 2012 to November 10, 2015, Rosario's primary care provider, Dr. Betzy Acevedo Rodriguez ("Dr. Acevedo") treated Rosario for hyperlipidemia; muscle spasm; pain in the joints, neck, shoulder, and low back; insomnia; urinary tract infection; and varicose veins; and she recorded diagnoses of depression and anxiety. Tr. 177-96, 587-615, 620-52, 691-92, 695-96, 704, 709. Treatment records show that Rosario frequently

suffered muscle spasm in the neck, joint swelling, joint pain, and back pain, Tr. 589, 591-92, 595-96, 599, 609, 612, 621, 627-28, 633, 637, 642, 647-48, 650, and at times Dr. Acevedo noted pain facies, Tr. 639, 643. Typically, Rosario was negative for signs of neurological problems such as muscle weakness, memory loss, tremors, or paralysis, Tr. 588, 592, 595-96, 599, 602-03, 609, 612, 621-22, 627, 634, 637, 642-43, 647, 651, though she occasionally had muscle weakness, Tr. 253, 609, 694. Her gait was normal. Tr. 592, 596, 603, 607, 609, 622, 628, 639, 643, 648, 651. Records show that Rosario also suffered from sleep problems, Tr. 605, 620, 626, 632, 637, as well as leg pain due to varicose veins and ankle edema. Tr. 603, 606, 621, 628, 633, 639. Dr. Acevedo prescribed Adipex, Dexamethasone, Diclofenac, Indocin, Keflex, Ketorolac, Neurontin, and Zocor. *See, e.g.*, Tr. 587. She also referred Rosario for physical therapy. *See* Tr. 197-200, 616-619. Physical therapy records dated from September 19 to October 4, 2013 are largely illegible but show complaints of pain in the neck, back, and shoulder causing dizziness and headache. Tr. 197. Therapists recorded shoulder sensitivity and moderate muscle spasms as well as acute pain in the back and shoulder. *Id.*

Rosario sought similar treatment with Dr. Luz Bartolomei ("Dr. Bartolomei") from December 15, 2015 to November 2, 2016. Rosario visited Dr. Bartolomei with complaints of neck, back, leg, shoulder, and joint pain, as well as muscle spasm and rash. Tr. 374, 378, 380, 382, 830, 849. Diagnoses included major depressive disorder, anxiety disorder, mixed hyperlipidemia, spondylosis, cervicalgia, radiculopathy, pure hypercholesterolemia, low back pain, and acute upper respiratory infection. Tr. 388, 828. Dr. Bartolomei prescribed Benadryl, Ibuprofen, Loratadine, Phentermine, Simvastatin, and Tramadol. Tr. 829.

In January 2015, Rosario visited Dr. William O. Hurtado ("Dr. Hurtado") for venous insufficiency. Tr. 674. Dr. Hurtado performed a microphlebectomy to remove varicose veins. Tr. 674-76. At a follow-up appointment, he found no complications, no active bleeding, and no evidence of infection. Tr. 674-75. The treated areas were erythematous and slightly swollen. Tr. 674. Dr. Hurtado advised Rosario to ambulate regularly and use compressive stockings. Tr. 675.

On June 5, 2015, Rosario sought emergency treatment for pain in the cervical area with a herniated disc. Tr. 683. Doctors found no neurological deficits and reported that Rosario's spine was aligned with no muscle spasm or spinal cord compression. *Id.* Her extremities had full range of motion with adequate muscular, joint, and ligament function and anatomy. *Id.* She decided not to get surgery. *Id.* Physicians prescribed Toradol and Nabumetone, discharged Rosario in stable condition, and advised her to follow up with her primary care physician. Tr. 683-85.

In September 2015, Rosario suffered an accident that again brought her to the emergency room. She was in her backyard taking care of a plant when she felt something sting her hand. Tr. 253. Her hand became swollen, and she went to Hospital Perea. Tr. 253, 686. Doctors reported left arm edema, erythema, and movement limitation. Tr. 679. Otherwise, they reported no gross, sensorial, cognitive or motor deficits, no movement limitation in the neck, an aligned spine with no spasm or spinal cord compression, and adequate muscular, joint, and ligament function and anatomy. *Id.* Rosario underwent surgery on her left hand abscess and was prescribed various medications. Tr. 680, 688. At discharge, she was alert, cooperative, well oriented, and ambulatory and the prognosis was good. Tr. 686, 689.

Laboratory findings from 2013 to 2016 showed various spinal abnormalities. Imaging of the cervical spine dated January 11, 2013 showed minimal spondylosis at C5-C6 and discogenic changes with involvement of the foramina. Tr. 623. Lumbar spine imaging taken the same day showed spondylosis and possible right distal ureterolithiasis. Tr. 532. Spinal imaging dated December 16, 2013 showed intervertebral disc space narrowing with small osteophytes. Tr. 625. On January 14, 2014, a cervical spine MRI showed paraspinal muscle spasm, spondylosis, degenerative disc disease, and degenerative endplate changes. Tr. 624, 715. This included C3-C4 posterior marginal osteophyte indent; C4-C5 and C5-C6 posterior disc bulges indenting the thecal sac and abutting the spinal cord, a small posterior disc protrusion at C6-C7 indenting the thecal sac, and bilateral neuroforamina narrowing at C5-C6. Tr. 624. Cervical spine imaging dated May 23, 2016 showed mild to moderate spondylosis at C5-C6, mild endplate spurring anteriorly at C4-

C5, and mild facet arthropathy. Tr. 729. And a cervical spine MRI dated June 13, 2016 showed mild cervical spondylosis and borderline right Level II lymph node. Tr. 726.

Non-examining state agency physicians reviewed the record on October 22, 2013 and May 20, 2014, but both found insufficient evidence to assess Rosario's physical impairments. Tr. 396, 410. The Commissioner attempted to schedule physical consultative examinations on two occasions, but Rosario did not go to those appointments. Tr. 60-61.

The record also contains evidence of a mental impairment. From August 15, 2011 to October 4, 2016, Rosario sought treatment at APS Clinics of Puerto Rico, where she would be diagnosed with major depressive disorder, anxiety disorder, and personality disorder. Tr. 750. She presented with complaints of lack of energy and motivation during the day, negative thoughts, variable appetite, anxiety, irritability, low self-esteem, crying, and yelling. Tr. 159, 556. Treatment included pharmacotherapy and psychotherapy, including prescriptions for Wellbutrin, Xanax, Ambien, Prozac, and Lorazepam. Tr. 156, 226, 231, 557, 758, 795, 816. Generally, treatment records show that Rosario was clean, alert, logical, coherent, relevant, and oriented. Tr. 138, 151, 227, 229, 234, 287, 294, 302, 314, 320-21. Rosario's mood was usually depressed and anxious. Tr. 145, 149, 151, 159, 557. Occasionally she was hostile, irritable, and defensive, Tr. 227, 229, while at other times she was calm, Tr. 337, 364, 369. Her judgment and insight were generally adequate, Tr. 138, 143, 149, 151, 227, 229, 288, 294, 309, 344, but she sometimes presented with poor judgment and diminished insight, Tr. 232, 234, 321. Rosario's impulse control was generally fair or normal, Tr. 227, 229, 293, 320, 337, 342, 369, but on at least one occasion it was poor, Tr. 331. Some visits show that her oral expression was poor, she spoke in a low tone, she had flight of ideas, and she presented with psychomotor agitation. Tr. 229, 287, 302, 308, 320. At times, her sleep and appetite were disturbed. Tr. 138, 149, 234, 236. APS professionals often reported that Rosario's immediate, recent, and remote memory were intact; her concentration adequate; and her intelligence average. Tr. 227, 229, 288, 294, 344, 349, 366, 371. However, records also include instances of diminished concentration, Tr. 303, 309, 315, 321, 333, 354, 359, and fair rather than intact memory, Tr. 303, 327, 354, 359. In at least one instance, APS professionals reported a

moderate attention disorder, Tr. 326, but other records show no attention disorder, Tr. 308, 314, 347. Usually, Rosario suffered no delusions or hallucinations, Tr. 293, 302, but APS doctors once reported that she heard voices at night that call to her, Tr. 288. In response, they increased her medication. Tr. 288. Rosario's GAF score at APS was usually 60 and occasionally higher.[1] Tr. 547, 557-58, 569, 657, 659, 666.

At most visits to APS, Rosario had no suicidal ideas. However, on July 24, 2013, APS professionals reported that Rosario was a suicide risk and assigned her a GAF score of 20.[2] Tr. 236, 667-68. They referred her to Cabo Rojo Metropolitan Hospital where she was hospitalized for psychiatric treatment until July 29. Tr. 161-70, 572-80. Her GAF was less than 20 at admission and 70 at discharge.[3] Tr. 575. APS treatment notes dated after Rosario's hospitalization show that she was not a suicide risk. Tr. 663.

On August 12, 2013, Rosario visited Dr. Alberto Rodriguez Robles ("Dr. Rodriguez") for a consultative examination. Tr. 171, 581. She explained that she felt depressed, that she spends her time lying down, forgets things, and felt alone without any desire to do anything. Tr. 173. Dr. Rodriguez noted that Rosario took Gabapentin, Alprozolam, Bupropion, Vasoflex, Simvastatin, and Ambien and that she had taken Alprazolam on the day of the examination. Tr. 172, 582. Rosario stated that her daily activities included personal grooming, taking medications, cooking, making payments and managing money, watching television, and entertainment in the house. Tr.

---

[1] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)). Scores of 51 to 60 indicate moderate symptoms or difficulty in functioning. *Id.* "[D]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (internal quotation marks and citation omitted).

[2] A GAF of 20 indicates "[s]ome danger of hurting self or others." *Sweeney v. Commr. of Soc. Sec.*, 847 F. Supp. 2d 797, 803 n. 7 (W.D. Pa. 2012).

[3] A GAF of 70 indicates "'[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.'" *Tracy v. Astrue*, 518 F. Supp. 2d 1291, 1301 n.3 (D. Kan. 2007) (quoting DSM–IV–TR at 34).

172. She lived in her own house with her son and did not visit others, though she received visits from family. Tr. 173. Rosario explained that she felt anxious in a group and responded to stressful situations by screaming, speaking loudly, and "bad-mouth[ing]." *Id.* Dr. Rodriguez observed that Rosario was alert with good hygiene and that she was cooperative with good visual contact. *Id.* He found that her affective state was depressed and anxious and that her psychomotor activity was slow. *Id.* Her mood was appropriate to the situation and her affective expression restricted. Tr. 173. Rosario's speech was spontaneous, slow, with audible volume, adequate production, and adequate vocabulary. *Id.* Her thought organization was logical, coherent, and relevant without loose associations, circumstantiality, tangentiality, flight of ideas, perseverance, or blocks. *Id.* Dr. Rodriguez reported no obsessions, compulsions, phobias, ideas of reference, delusions, perceptual disorders, hallucinations, illusions, or suicidal or homicidal ideas. *Id.* Although Dr. Rodriguez administered various cognitive tests, he cautioned that Rosario had already taken Alprazolam and that the results should be understood in that context. *Id.* Cognitive tests showed that Rosario was oriented and knew who she was, where she was, the day's date, and the day of the week. *Id.* Her immediate memory was diminished but her short-term, past, and remote memory were adequate. Tr. 174, 584. Rosario's attention span was short: she got distracted easily, and Dr. Rodriguez had to repeat questions so she could perform the exam. Tr. 174. Her concentration was adequate: she could name the months of the year backwards and spell the word "world" forwards and backwards. *Id.* Dr. Rodriguez also found that Rosario's general knowledge was in accordance with her experience and academic grade and that she was up to date with events happening in society. *Id.* She could not interpret the proverb, "You don't look a gift-horse in the mouth." *Id.* Dr. Rodriguez found that Rosario's judgment and self-criticism were both adequate, as she demonstrated insight into her mental condition. *See* Tr. 174-75. However, her social interaction during the interview was limited by psychomotor slowness and short attention span. Tr. 175. At the end of the examination,

Dr. Rodriguez assigned a GAF score of 50 and found that Rosario did not have the ability to manage her funds.[4] *Id.*

On August 1, 2013, non-examining state agency psychologist Dr. Zulma Nieves ("Dr. Nieves") reviewed the record. Tr. 395. She found that Rosario suffered from a severe depressive disorder and considered Listing 12.04, explaining that Rosario had moderate restrictions in activities of daily living; mild difficulties in maintaining social functioning as well as in concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. Tr. 396-98. Dr. Nieves determined that Rosario was not significantly limited with respect to the following: the ability to carry out short, simple or detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple, work-related decisions; to complete a normal workday and workweek without interruptions and perform at a consistent pace without unreasonable rest periods; to respond appropriately to changes at work; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. Tr. 398-99. She determined that Rosario was moderately limited in her ability to maintain attention and concentration for extended periods and in the ability to travel in unfamiliar places or use public transportation. Tr. 398-99.  Given the evidence, Dr. Nieves opined that Rosario could perform simple, detailed tasks. Tr. 399. However, she also stated that there was insufficient information to properly assess Rosario's limitations, explaining that she wanted more information about Rosario's hospitalization. *Id.*

On May 19, 2014, non-examining state agency psychologist Dr. Jesus Soto ("Dr. Soto") reviewed the record. He determined that Rosario suffers from a severe depressive syndrome with mild limitation in activities of daily living and maintaining social functioning as well as moderate

---

[4] "A GAF of 41-50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupations, or school functioning (e.g., no friends, unable to keep a job).'" *López-López v. Colvin*, 138 F. Supp. 3d 96, 100 f.n. 6 (D. Mass. 2015) (quoting DSM-IV-TR at 34).

limitation in maintaining concentration, persistence, or pace. Tr. 411. He found no repeated episodes of decompensation, each of extended duration. *Id.* Dr. Soto also determined that Rosario was partially credible, explaining that the medical evidence did not sustain the level of symptom severity Rosario alleged. Tr. 412. He reported no understanding and memory limitations and no significant limitations in most areas of functioning. Tr. 412-13. However, he found moderate limitations regarding the following: the ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. *Id.* Dr. Soto found no social interaction limitations. Tr. 412. In reaching his conclusions, Dr. Soto gave controlling weight to APS notes and explained that, although Rosario suffers from thought blocks, defensive behavior, and a depressed mood, her judgment and cognitive processing is fair. Tr. 414. Further, she is consistently alert and coherent without gross cognitive deficits. *Id.* Her thought process is logical and reality-based, and the record shows adequate stress tolerance, impulse control, and simple understanding and follow-up on verbal commands. *Id.* Ultimately, he opined that Rosario could "[l]earn, understand, remember and carry out simple work instructions, maintain attention and concentration for two hour periods w/o undue interruptions, perform as per schedule and routine, appropriately interact with supervisors, co-workers and others, and can adequately complete a normal workweek and workday." *Id.*

On December 14, 2016, Rosario appeared at a hearing before an ALJ. Tr. 38. She testified that she could not work because pain limits the amount of time that she can stay on her feet and she cannot carry things. Tr. 48. Rosario explained that she lives by herself but relies on her mother's assistance. Tr. 45-47. On a typical day, she wakes up in the morning, prepares a simple breakfast, like cereal, and then sits on the balcony or watches television. Tr. 49-50. Her daughter calls her to ask if she has taken her medication. Tr. 50. She takes her medication, but it makes her feel sleepy,

so she naps around 11:00 am or 12:00 pm. Tr. 49-51. Her naps last around two hours. Tr. 51. In the afternoon, Rosario's mother might call her, she might shower or sit on the balcony, or her neighbor might visit to ask how she is doing. *Id.* In the evening, she prepares her own dinner. *Id.* The night before the hearing, her dinner included spaghetti from a can, cookies, and a glass of milk. Tr. 51. After dinner, she takes her medicine and goes to sleep around 10:00 or 11:00 pm. Tr. 52. But she struggles to sleep because of the things she thinks about. *Id.* Rosario also explained that her daughter pays her bills, and her mother shops for her. Tr. 49, 52. However, she can walk to a store next to her house to buy a few things. Tr. 49. It takes her three minutes to get to the store, and the total journey might take five to ten minutes. *Id.* She does not drive because she gets nervous and feels as if she does not know where she is, so someone else takes her to medical appointments. Tr. 48-49. Rosario also testified that she could walk up to half an hour inside her home and sit for twenty-five to thirty minutes. Tr. 48. After that, she must change positions, move, or lay down due to pain. *Id.*

Dr. Wildaliz Caro ("Dr. Caro"), a medical expert, also testified at the hearing. Tr. 56. Dr. Caro explained that Rosario's psychiatric hospitalization was a full admission for major depression, recurrent episode, with psychotic characteristics and a GAF of less than 20. *Id.* At discharge, she was diagnosed with moderate major recurrent depression and assigned a GAF of 78, suggesting transitory symptoms. *Id.* Dr. Caro also summarized APS treatment notes, explaining that they showed somewhat variable symptoms with a GAF remaining at 60, indicating moderate symptoms. Tr. 57. The initial diagnosis at APS was unspecified, followed by a diagnosis of severe recurrent major depression as of May 9, 2012, which was changed to moderate recurrent depression as of May 6, 2015. *Id.* A diagnosis of unspecified personality disorder was added on November 6, 2015. *Id.* Dr. Caro also discussed Dr. Rodriguez's consultative examination, explaining that Dr. Rodriguez's GAF score of 50 was inconsistent with the GAF of 60 assigned by treating physicians. *Id.* Additionally, Dr. Caro testified that Rosario's limitations did not meet or equal Listing 12.04, as her paragraph B limitations were slight, moderate, or none. She opined that Rosario could make simple, work-related decisions; perform simple, routine, repetitive tasks;

interact frequently with the public, co-workers and supervisors; adapt to simple changes at work; and concentrate on simple tasks for two hours before she would need a break. Tr. 58.

A vocational expert ("VE") also testified that a hypothetical person of Rosario's age, education, and work experience could perform certain jobs available in the national economy if she had the following limitations: the person could sit, stand, and walk for six hours of each workday but work in an area where she could stand without leaving the workstation; lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; frequently perform postural movements and reaching; perform simple, routine, repetitive work with simple instructions; concentrate on simple tasks for two hours; make simple work decisions and adapt to simple changes; and interact frequently with co-workers, the public, and supervisors. Tr. 59-60. According to the VE, such a person could not perform Rosario's past work, but she could work as an inspector of missing parts, assembler of small parts, or electrode cleaner. Tr. 60. However, such a person could not find work if she had to take a two-hour nap during the day. Tr. 61.

The ALJ announced her decision on January 19, 2017. Tr. 32. She determined that Rosario had not engaged in substantial gainful activity from August 29, 2010 (her alleged onset date) through December 31, 2015 (her date last insured). Tr. 23. She found that Rosario had the following severe impairments: disorders of the cervical spine and major depressive disorder with anxiety. Tr. 23. She determined that Rosario's low back condition, hyperlipidemia, shoulder pain, venous insufficiency, and obesity were not severe. Tr. 23-24. At step three, the ALJ concluded that Rosario's impairments neither met nor equaled a listing, considering both Listings 1.04 and 12.04. Tr. 24. The ALJ then determined that Rosario could perform a reduced range of light work,[5] with the following exceptions:

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Individuals capable of performing light work can also perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

Rosario v. Commissioner of Social Security, Civil No. 19-1413 (BJM)                    14

> She could lift, carry, and push/pull 20 pounds occasionally and 10 pounds frequently. During an eight-hour workday, she could sit, stand, and walk for about six hours each, at jobs that could be performed either sitting or standing, without leaving the workstation. The claimant could frequently climb stairs, ramps, ladders, ropes and scaffolds, and she could frequently balance, stoop, kneel, crouch and crawl. The claimant retained the capacity for frequent reaching and unlimited handling and fingering. She retained the capacity to perform simple, routine and repetitive tasks and to concentrate at these simple tasks for two-hour periods. She could make simple work-related decisions, adapt to simple changes, and interact adequately with public, supervisors and coworkers on a frequent basis.

Tr. 26. In reaching this conclusion, the ALJ explained that Rosario's reports regarding the severity of her symptoms were inconsistent with other evidence. Tr. 27-29. For instance, while Rosario alleged disabling pain, records from Dr. Acevedo showed essentially unremarkable physical exams aside from muscle spasm and conservative treatment. Tr. 27-28. Similarly, although Rosario testified that she could not go out alone and had difficulty walking and standing, various medical records show that she arrived to appointments alone and that she was ambulatory. Tr. 28. The ALJ also gave great weight to Dr. Caro's opinion, as she was familiar with the Commissioner's regulations and reviewed the complete record including the most recent evidence. Tr. 29. The ALJ also gave great weight to the opinions of the state agency consultants, which were consistent with the record and Dr. Caro's opinion. Tr. 29-30. She explained that she gave partial weight to Dr. Rodriguez's assessment, agreeing with most of his findings but explaining that the reported GAF of 50 was inconsistent with treating source evidence, testimony of Dr. Caro, and his own examination findings. Tr. 30.

Next, the ALJ determined that Rosario could not perform her past relevant work as a hospital cleaner. Tr. 30. Nonetheless, in light of vocational expert testimony, Rosario could perform work as an inspector of missing parts, assembler, or electrode cleaner. Tr. 32. Accordingly, the ALJ found that Rosario was not disabled under the Act. *Id.*

The Appeals Council denied review, Tr. 1, and this action followed.

Rosario v. Commissioner of Social Security, Civil No. 19-1413 (BJM)                                    15

## DISCUSSION

Rosario raises the following arguments: (1) the ALJ's mental RFC determination is unsupported by substantial evidence because she improperly assigned Dr. Rodriquez's opinion partial weight; (2) the ALJ erred by failing to provide a function-by-function assessment when determining her RFC; and (3) the ALJ erred at step five in failing to find her disabled under the the Grid.[6] I will address each argument in turn.

RFC is the most a claimant can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* The ALJ must weigh all the evidence and make certain that his or her conclusion rests upon clinical examinations as well as medical opinions. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 28, 224 (1st Cir. 1981). However, the claimant is responsible for providing the evidence of an impairment and its severity; and the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (*citing Richardson v. Perales*, 402 U.S. 389 (1971)).

The ALJ made the following mental RFC determination:

[Rosario] retained the capacity to perform simple, routine and repetitive tasks and to concentrate at these simple tasks for two-hour periods. She could make simple work-related decisions, adapt to simple changes, and interact adequately with public, supervisors and coworkers on a frequent basis.

---

[6] Rosario alludes to other potential arguments related to the severity of her impairments, Listings 1.04 and 12.04, and her capacity to sit and stand. *See* Dkt. 15 at 9, 21-22. These arguments are waived for lack of development and relevant citation to the record. *See Harriman v. Hancock Cnty.*, 627 F.3d 22, 28 (1st Cir. 2010) ("'It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990)); *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988) (a party has a duty "to spell out its arguments squarely and distinctly").

Tr. 26. This determination is supported by the opinions of Dr. Caro, Dr. Nieves, and Dr. Soto, and it is consistent with treatment records from APS.

Dr. Caro, who had the benefit of reviewing the complete record, testified that Rosario could make simple, work-related decisions; perform simple, routine, repetitive tasks; interact frequently with the public, co-workers, and supervisors; adapt to simple changes at work; and concentrate on simple tasks for two hours before she would need a break. Tr. 58. Non-examining state agency psychologists Drs. Nieves and Soto also both determined that Rosario was either not significantly limited or moderately limited in all areas of mental functioning. Tr. 398-99, 412-13. Indeed, Dr. Soto opined that Rosario could "[l]earn, understand, remember and carry out simple work instructions, maintain attention and concentration for two hour periods w/o undue interruptions, perform as per schedule and routine, appropriately interact with supervisors, co-workers and others, and can adequately complete a normal workweek and workday." Tr. 414. And Dr. Nieves determined that Rosario could perform simple, detailed tasks. Tr. 399. Although Dr. Nieves requested further information to perform a complete assessment, Dr. Caro had the benefit of the entire record and nonetheless concurred with Dr. Nieves's initial opinion.

These opinions, all of which support the ALJ's mental RFC determination, are generally consistent with treatment records from APS. Those records show that Rosario suffers from a severe mental impairment that requires ongoing treatment, including pharmacotherapy and psychotherapy. Tr. 156, 226, 231, 557, 758, 795, 816. They show that Rosario frequently suffers from a depressed and anxious mood, Tr. 145, 149, 151, 159, 557; that she is sometimes hostile, irritable, and defensive, Tr. 227, 229; and that her condition can cause diminished concentration and insight, poor judgment and impulse control, and psychomotor agitation. Tr. 229, 232, 234, 302, 308, 320-21, 331, 333, 354, 359. But those records do not indicate that Rosario is incapable of performing simple tasks, concentrating for two hours, making simple work-related decisions, adapting to simple changes, or interacting with others frequently. Rather, APS records show a consistent GAF score around 60, indicating moderate symptoms or difficulty in functioning. *See* DSM–IV–TR at 32-34. APS records also indicate that, despite her depression and anxiety, at many

visits Rosario was clean, alert, logical, coherent, relevant, and oriented. Tr. 138, 151, 227, 229, 234, 287, 294, 302, 314, 320-21. She had adequate judgment and insight, Tr. 138, 143, 149, 151, 227, 229, 288, 294, 309, 344; average intelligence, adequate concentration, intact memory, Tr. 227, 229, 288, 294, 344, 349, 366, 371; and fair or normal impulse control, Tr. 227, 229, 293, 320, 337, 342, 369.

Still, Rosario correctly identifies portions of the record that indicate more serious symptoms. For example, in one instance Rosario reported hearing voices at night that call to her. Tr. 288. Additionally, Rosario endured a psychiatric hospitalization from July 24 to July 29, 2013, with a GAF score of 20 or less at admission, indicating "[s]ome danger of hurting self or others." *Sweeney*, 847 F. Supp. 2d at 803 n. 7. Undoubtedly, this was a serious episode in Rosario's life. But records also show that Rosario was discharged with a GAF of 70, Tr. 575, that she was no longer considered a suicide risk at APS after her hospitalization, Tr. 663, and that she did not have suicidal ideas during her consultative examination, which occurred shortly after her hospitalization. Tr. 173. Additionally, Dr. Caro opined that these symptoms were transitory. Tr. 56. The ALJ was entitled to credit this opinion. *See Evangelista*, 826 F.2d at 141 ("Conflicts in the evidence are, assuredly, for the Secretary—rather than the courts—to resolve.").

Similarly, portions of Dr. Rodriguez's examination were more favorable to Rosario's position. For instance, Dr. Rodriguez reported that Rosario's attention span was short, explaining that he had to get her attention and repeat questions so she could perform the cognitive exam. Tr. 174. He also found that Rosario's immediate memory was diminished, that she could not interpret a proverb, and that her social interaction was limited. Tr. 174-75, 584. Further, he assigned a GAF score of 50, indicating serious symptoms, and found that Rosario did not have the ability to manage her funds. Tr. 175. Contrary to Rosario's contention, however, the ALJ was not required to credit this opinion. It is the ALJ's duty to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *Evangelista*, 826 F.2d at 141. Here, Dr. Rodriguez's more serious findings are inconsistent with the opinions of Drs. Caro, Nieves, and Soto, and the

assigned GAF score of 50 is inconsistent with the GAF score of 60 appearing throughout APS treatment records. Moreover,

> [b]y itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that [the Commissioner] consider[s] with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*Lane v. Colvin*, No. C13–5658–MJP, 2014 WL 1912065, *9 (W.D. May 12, 2014) (quoting AM–13066). Here, Dr. Rodriguez's GAF score of 50 was a single snapshot opinion that contradicted other portions of the record, including some of his own findings. Indeed, he reported that Rosario was alert with good hygiene and cooperative with good visual contact; that her thought process was logical, coherent, and relevant without loose associations, circumstantiality, tangentiality, flight of ideas, perseverance, or blocks;  that her short-term, past, and remote memory were adequate; that her concentration was adequate; that her general knowledge was in accordance with her experience and academic grade; that she was oriented and up to date with events happening in society; and that her judgment and self-criticism were both adequate, as she demonstrated insight into her mental condition. *See* Tr. 173-75, 584. In light of the internal inconsistencies in Dr. Rodriguez's opinion as well as its inconsistency with other portions of the record, I detect no error in the ALJ's determination to accord Dr. Rodriguez's opinion only partial weight.

Nor did the ALJ err in declining to adopt counsel's proposed additional limitation: that Rosario must sleep every day mid-day for two hours. *See* Dkt. 15 at 16. Although the record shows that Rosario takes medication that makes her drowsy, *see* Tr. 49-51, it does not reflect a requirement that said medication be taken mid-day. Moreover, the ALJ provided a thorough explanation for why she credited the type of symptoms Rosario reported but not their severity, identifying several inconsistencies between Rosario's self-reports and other record evidence. *See* Tr. 27-29 (discussed below). Additionally, Dr. Rodriguez administered various cognitive tests after Rosario had already taken the medication at issue, and, although her attention span was short and immediate memory diminished, she nonetheless performed the exams, demonstrating adequate,

concentration, judgment, self-criticism, general knowledge, and short-term, past, and remote memory. Tr. 173-75, 584.

After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's mental RFC finding.

Next, Rosario maintains that remand is necessary because the ALJ failed to provide a function-by-function assessment as required by Social Security Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996) ("SSR 96-8p"). I disagree.

SSR 96-8p provides that, before classifying a claimant's RFC in terms of exertional levels of work (i.e., whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96–8p, 1996 WL 374184, at *1. The functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945 include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013). The ALJ must also "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence ..." SSR 96–8p, 1996 WL 374184, at *7. The policy behind this requirement is clear: without a function-by-function assessment, an ALJ may "overlook[] some of an individual's limitations or restrictions," which "could lead to an incorrect use of an exertional category to find that the individual is able to do past relevant work" and "an erroneous finding that the individual is not disabled." *Id.* at *4. Although an ALJ should address all the functional limitations associated with a claimant's impairments, failure to do so will not invalidate the decision if the functional limitations can be otherwise inferred. *See Cichocki*, 729 F.3d at 177; *Mandarano v. Berryhill*, 372 F. Supp. 3d 1, 5

(D. Mass. 2019) (ALJ sufficiently complied with SSR 96–8p where, although he did not expressly perform a function-by-function analysis, other findings implied that he had performed the requisite assessment); *Gallagher v. Astrue*, 08-CV-163-PB, 2009 WL 929923, at \*8 (D.N.H. Apr. 3, 2009) (ALJ met requirements of SSR 96–8p despite vague RFC determination and no explicit function-by-function assessment because ALJ discussed claimant's functional abilities in body of opinion and adopted functional assessment of medical source).

In Rosario's case, the ALJ determined that Rosario could perform a reduced range of light work with the following functional limitations:

> She could lift, carry, and push/pull 20 pounds occasionally and 10 pounds frequently. During an eight-hour workday, she could sit, stand, and walk for about six hours each, at jobs that could be performed either sitting or standing, without leaving the workstation. The claimant could frequently climb stairs, ramps, ladders, ropes and scaffolds, and she could frequently balance, stoop, kneel, crouch and crawl. The claimant retained the capacity for frequent reaching and unlimited handling and fingering. She retained the capacity to perform simple, routine and repetitive tasks and to concentrate at these simple tasks for two-hour periods. She could make simple work-related decisions, adapt to simple changes, and interact adequately with public, supervisors and coworkers on a frequent basis.

Tr. 26. The ALJ thus expressly set out a series of exertional and non-exertional limitations, including those related to Rosario's ability to sit, stand, walk, lift, carry, push, pull, concentrate, make decisions, perform tasks, make decisions, adapt to change, and interact with others, including supervisors.[7]

In establishing these limitations, the ALJ included a detailed narrative explaining her reasoning and considering Rosario's alleged symptoms, the objective medical evidence, treatment records, and opinion evidence. Tr. 27-29. The ALJ considered Rosario's allegations of disabling pain but explained that she did not credit the severity alleged in light of other inconsistent evidence.

---

[7] "Limitations are classified as exertional if they affect [a claimant's] ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. . . . Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 404.1569a(a).

Tr. 27-28. For instance, records from Dr. Acevedo showed essentially unremarkable physical exams aside from muscle spasm and conservative treatment. Tr. 27-28. Similarly, although Rosario testified that she could not go out alone and had difficulty walking and standing, various medical records show that she arrived to appointments alone and that she was ambulatory. Tr. 28. Likewise, although she alleged inability to perform household chores, she suffered an insect bite while in her yard attending to a plant. Tr. 28. The ALJ also discussed the opinion evidence, acknowledging Dr. Caro's detailed explanation of the record and assigning great weight to his opinion that Rosario could perform simple, repetitive tasks; make simple work-related decisions; and interact frequently with others. Tr. 29. She also gave great weight to the state agency psychological consultants' opinions that Rosario could learn, understand, remember, and execute simple instructions; sustain pace and attention; persist at work activities during a regular workday and workweek; adjust to changes in routine; and interact in a socially acceptable way. Tr. 29-30. Additionally, the ALJ explained her reasoning for assigning Dr. Rodriguez's assessment little weight, considered Rosario's work history and reasons for leaving her job, and discussed Rosario's hospitalization and treatment at APS. Tr. 28-30. In other words, after a thorough examination of the evidence of Rosario's relevant limitations, the ALJ concluded that Rosario's impairments did not prevent her from performing a reduced range of light work. I am satisfied that both the ALJ's functional assessment and narrative discussion were sufficient to comply with the requirements of SSR 96–8p.

Finally, Rosario argues that the ALJ erred at step five in failing to find her disabled under the Grid. At step five, the claimant has met his or her burden to show that he or she is unable to perform past work, and the burden shifts to the Commissioner to come forward with evidence of specific jobs in the national economy that the claimant can still perform. *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). The Commissioner may satisfy this burden by obtaining testimony from a vocational expert or, where appropriate, by referencing the Grid. *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). The Grid "consists of a matrix of the applicant's exertional capacity, age, education, and work experience. If the facts of the applicant's situation fit

within the Grid's categories, the Grid 'directs a conclusion as to whether the individual is or is not disabled.'" *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a)).

Rosario correctly identifies an error in the ALJ's step five analysis. Specifically, at step five, the ALJ wrote as follows:

> The claimant was born on January 7, 1962 and was 53 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age.

Tr. 31. On her date last insured, Rosario was 53 years old, which means she was closely approaching advanced age for purposes of the Grid Rules. 20 CFR § 404.1563(d). The ALJ thus erred in writing that Rosario was a younger individual on her date last insured.

This error, however, was harmless, as the ALJ's subsequent analysis shows that she considered the appropriate Grid Rule. On her date last insured, Rosario was an individual closely approaching advanced age, with the equivalent of a high school education, unskilled work experience, and an RFC for a reduced range of light work. *See* Tr. 31. These attributes point the Commissioner to Grid Rule 202.13, which would direct a finding of not disabled for claimants with the capacity for a full range of light work. 20 C.F.R. pt. 404, subpt. P, App. 2, § 202.13. Rosario's contention that the ALJ should have found Rosario disabled under Grid Rules applicable to claimants with an RFC for sedentary work or advanced age is thus unavailing.

Here, the ALJ considered Grid Rule 202.13 and correctly concluded that reliance on this rule alone would be insufficient, given that Rosario's RFC was for a reduced, rather than full, range of light work. Tr. 31; *see Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (explaining that if the Grid does not "*completely and accurately* represent a claimant's limitations," the ALJ is required to obtain and consider vocational expert testimony) (emphasis in original); *Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989). The ALJ thus appropriately turned to VE testimony to determine whether any jobs were available in the national economy for Rosario. *See Foxworth v. Colvin*, 249 F. Supp. 3d 585, 590 (D. Mass. 2017) ("Under the First Circuit approach, if a claimant is on the lower end of an RFC and it is unclear whether the Grid will apply,

a vocational expert is brought in to clarify what jobs, if any, are available in the general economy

for the claimant."). The VE testified that a hypothetical person with Rosario's age, education, work

experience, and functional limitations (as ultimately adopted by the ALJ) could perform the work

of an inspector of missing parts, assembler, or electrode cleaner, and the ALJ concurred. Tr. 32,

59-60. Having reviewed the record, including VE testimony and the ALJ's decision, I find no error

at step five meriting remand.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of March, 2021.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge